**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| CHERYL HARRIS,<br><br>       Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>       Defendant. | CASE NO. 1:24-CV-02236<br><br>JUDGE CHARLES ESQUE FLEMING<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Cheryl Harris ("Plaintiff" or "Ms. Harris") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.       Procedural History

Ms. Harris filed her DIB and SSI applications on October 8, 2019, alleging disability beginning September 30, 2017.  (Tr. 51-52, 229-39.)  She subsequently amended her alleged onset date to July 29, 2020.  (Tr. 265.)   She alleged disability due to: degenerative disc disease; bone spurs; neck and back pain; chronic pain; depression; anxiety; and high blood pressure.  (Tr.

1

53, 75, 288.)  Her applications were denied at the initial level (Tr. 100-09) and upon

reconsideration (Tr. 119-34).  She then requested a hearing.  (Tr. 135-37.)

Following a telephonic hearing before an Administrative Law Judge ("ALJ") on February

10, 2022 (Tr. 33-50), an unfavorable decision by the ALJ on April 7, 2022 (Tr. 10-32), and an

appeal to the United States District Court for the Northern District of Ohio, the parties stipulated

to remand the matter to the Commissioner for further consideration of Plaintiff's claim (Tr. 826-

28) and the Appeals Council thereafter remanded the case to an ALJ on January 23, 2024 (Tr.

848-51).  Following the remand order, a telephonic hearing was conducted on August 8, 2024,

before a different ALJ.  (Tr. 761-96.)  The new ALJ issued a partially favorable decision on

August 28, 2024, finding Ms. Harris was not disabled prior to July 23, 2023, but became

disabled on that date and continued to be disabled through the date of the decision.  (Tr. 721-48.)

Plaintiff filed the pending appeal on December 23, 2024 (ECF Doc. 1), and the matter is fully

briefed (ECF Docs. 10, 12, 13).

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Harris was born in 1973.  (Tr. 53, 75, 283.)  She completed school through the

eleventh grade in 1991 and completed STNA training in 2009.  (Tr. 289.)  She worked as an

STNA, but stopped working because she could not tolerate the prolonged standing and walking.

(Tr. 290, 1140.)  She worked more recently at Shutterfly.  (Tr. 768-72, 776-77.)

### B.  Medical Evidence

#### 1.  Relevant Treatment History

In 2020, Ms. Harris received chiropractic treatment for her neck and back pain at

Crestline Chiropractic Clinic.  (Tr. 593.)  On May 21, 2020, Ms. Harris met with Aaron A.

Cochran, D.O., at Avita Health Galion Neurology, for a follow up regarding complaints of forgetfulness.  (Tr. 554.)  She reported having problems with her memory for years, but she said it had gotten worse over the prior year.  (*Id*.)  Her mental status examination was normal and neuropsychiatric testing did not reveal any neurodegenerative disorder.  (Tr. 558-59.)  Her physical examination revealed intact coordination and sensation, normal muscle tone and bulk, normal reflexes, normal gait, and negative Romberg.  (*Id*.)

A July 29, 2020 MRI of the lumbosacral spine showed moderate to severe central narrowing at L5-S1 related to grade 1 retrolisthesis, moderate facet arthropathy, and a broad-based disc protrusion that was more pronounced centrally.  (Tr. 655.)  The MRI also showed marked lateral recess narrowing bilaterally and moderate bilateral foraminal narrowing with abutment of the S1 nerve roots bilaterally and mild central narrowing and mild bilateral foraminal narrowing at L4-L5 related to a broad-based disc protrusion and mild to moderate facet arthropathy.  (*Id*.)

An MRI of the brain dated August 14, 2020, showed a Chiari malformation with cerebellar tonsillar herniation, absent CSF flow signal posterior to the cerebellum with reduced/absent flow signal within the distal ventricular collecting system, and mild white matter signal abnormality, possibly sequela migraines or early chronic small vessel ischemic disease. (Tr. 583.)  X-rays of the lumbar spine on September 15, 2020, showed some L4 and L5 degenerative disc disease and lumbar spondylotic change.  (Tr. 700.)  There was no sign of dynamic instability in flexion or extension.  (*Id*.)

On September 16, 2020, Ms. Harris presented to Joel Siegal, M.D., at Key Clinics Neurosurgery and Spine Specialists for evaluation and treatment of low and mid back pain.  (Tr. 700-02.)  She reported having low back pain for about thirty years.  (Tr. 700.)  Her symptoms

3

extended from her low back into her buttocks and hips bilaterally.  (*Id*.)  Her pain worsened with activity and improved somewhat with sitting.  (*Id*.)  She was never pain free.  (*Id*.)  She had not had injections, surgery, or physical therapy.  (*Id*.)  Dr. Siegal reviewed Ms. Harris's recent MRI and x-rays from July and September.  (*Id*.)  Ms. Harris's physical examination revealed 5/5 motor strength in the bilateral extremities, intact sensation to light touch in the left leg and right medial thigh, and moderate paraspinous pain with palpation.  (Tr. 701.)  Her "gait with the right foot boot was okay."[1]  (*Id*.)  Ms. Harris was diagnosed with spondylolisthesis of the lumbar region.  (Tr. 700.)  Dr. Siegal indicated that it appeared Ms. Harris had "some possible component of SI joint, muscular, and some degenerative change in the lumbar spine causing her pain in dysfunction."  (Tr. 701.)  He recommended bilateral L4 and L5 paraspinous facet block and physical therapy.  (*Id*.)  He did not observe a "surgical lesion that . . . if repaired would give her a high likelihood of improvement" in the "long-term."  (*Id*.)

On September 30, 2020, Ms. Harris presented to Dionysios Klironomos, M.D., at OhioHealth Neurological Physicians, for follow up regarding the Chiari malformation that was found on her brain MRI.  (Tr. 595.)  Dr. Klironomos reviewed the brain MRI and referred her to neurology for her short-term memory symptoms.  (Tr. 597.)   He did not recommend surgery for the Chiari malformation because Ms. Harris did not have headaches or signs or symptoms related to the condition.  (Tr. 595, 597.)

On December 2, 2020, Ms. Harris presented to Gubert Lee Tan, M.D., at OhioHealth Neurological Physicians for a neurological evaluation due to her reported memory problems. (Tr. 600.)  Physical examination findings included 5/5 gross strength, normal muscle tone and bulk, no muscle fasciculations, intact sensation, deep tendon reflexes 2+ symmetrically, and

---

[1] Ms. Harris was wearing a boot due to a right foot stress fracture.  (Tr. 690.)

stable gait and station.  (Tr. 602.)  Dr. Tan noted that he doubted neurodegenerative disease and speculated that Ms. Harris's reported cognitive dysfunction might be multifactorial due to her mental health conditions, fatigue, and insomnia.  (*Id*.)

On March 1, 2021, Ms. Harris presented to Janel S. Scarbrough, PA-C, at Avita Galion Emergency Medicine with right shoulder pain that had been ongoing for two to three weeks.  (Tr. 665-72.)  She reported daily pain that she rated 7/10, which radiated down her right arm, and numbness in her arm at times; she reported good range of motion in her shoulder.  (Tr. 665.)  Physical examination revealed tenderness in the cervical back, lateral right neck pain, posterior right shoulder pain, and mild numbness down the arm, but great range of motion and good capillary refill and pulses.  (Tr. 669.)  X-rays of the cervical spine revealed "[n]o acute bony abnormalities" and "C6-C7 degenerative disc disease with minimal bilateral neural foraminal bony encroachment."  (Tr. 671, 675.)  X-rays of the right shoulder showed "[n]o acute bony abnormalities."  (Tr. 671.)  PA Scarbrough diagnosed suprascapular entrapment neuropathy of the right side and recommended over-the-counter pain medication for pain and swelling, rest, ice, compression, and elevation of arm above heart level. (Tr. 671-72.)

On June 29, 2021, Ms. Harris presented to John T. Schoettmer, M.D., at Avita Galion Emergency Medicine for back pain.  (Tr. 651-57.)  She reported a flare up of sciatic back pain for the past month that radiated down her left leg.  (Tr. 651.)  She reported having back pain for years and recently seeing her primary care physician for the flare up; prednisone was prescribed but had not really helped.  (*Id*.)  Ms. Harris's musculoskeletal examination revealed normal range of motion of the major joints with some mild to moderate subjective tenderness in her lumbar spine.  (Tr. 655.)  She ambulated without difficulty and there were no appreciable sensory deficits.  (*Id*.)  Ms. Harris's July 2020 lumbosacral MRI and September 2020 back x-

rays were reviewed.  (*Id*.)  Ms. Harris appeared agitated and was frustrated after waiting in the emergency room for 45 minutes.  (*Id*.)  She was not interested in obtaining further imaging and was focused on receiving a steroid injection to treat her pain.  (*Id*.)  She reported she had been prescribed Neurontin and Zanaflex by her primary care physician.  (*Id*.)  Ms. Harris was diagnosed with acute exacerbation of chronic low back pain.  (Tr. 656.)  Dr. Schoettmer agreed to administer the steroid injection, noting there was "no convincing evidence" that Ms. Harris needed "acute-care hospitalization or any further emergent testing or intervention."  (Tr. 655.)

On July 9, 2021, Ms. Harris returned to Avita Galion Emergency Medicine, complaining of back pain.  (Tr. 644.)  She was treated by Ashley M. Sudol, APRN-CNP.  (*Id*.)  Ms. Harris reported she was scheduled to see Dr. Siegal in the coming weeks, but said she could not wait that long due to her pain.  (*Id*.)  She reported that Dr. Siegal's office had recommended that she go to the emergency room for a cortisone shot.  (*Id*.)  She reported that the injection she received on June 29 had provided mild relief.  (*Id*.)  She reported some numbness and tingling in her left lower extremity, and denied weakness and bowel or bladder incontinence.  (*Id*.)  On examination, Ms. Harris had normal range of motion in her cervical spine.  (Tr. 648.)  In her lumbar spine, the examination noted tenderness and decreased range of motion, but negative straight leg raise bilaterally.  (*Id*.)  Ms. Harris received a steroid injection, was prescribed a short supply of tramadol, and was discharged home in stable condition.  (Tr. 649-50.)

On July 21, 2021, Ms. Harris returned to Dr. Siegal for complaints of low back pain, sciatica down the posterior of left thigh to the knee, and numbness of the left foot.  (Tr. 634-36.)  She reported a long history of low back discomfort while walking, but with progressively worsening back and left leg pain over the prior four to six weeks.  (Tr. 634.)  During the physical examination, Ms. Harris had a lot of trouble moving from sitting to a standing position.  (*Id*.)

6

She had a positive straight leg raise on the left.  (Tr. 635.)  Left dorsiflexion and plantar flexion were 4/5.  (*Id*.)  Dr. Siegal noted decreased light touch in the left big toe lateral foot and medial ankle with "tingling" in the foot at baseline.  (*Id*.)  He also noted that: a July 2020 MRI showed a large disc herniation at L5, a smaller central paracentral disc protrusion at L4, and degenerative disc disease at L4 and L5; and x-rays from July 20, 2021, showed significant L5 degenerative disc disease with disc height loss in the lumbar spine.  (Tr. 634.)  Ms. Harris was diagnosed with: spinal stenosis, lumbar region with neurogenic claudication; lumbar disc herniation with radiculopathy; and other spondylosis with radiculopathy, lumbar region.  (Tr. 634-35.)  Dr. Siegal ordered an MRI of the lumbar spine and a bone density study "to help with possible surgical plan in preparation for consideration of a disc replacement."  (Tr. 635.)

On August 9, 2021, Ms. Harris presented to Barbara Wickham, ARPN-CNP, at Avita Health Internal Med & Gastro Galion with complaints of "not feeling like she want[ed] to wake up in the morning."  (Tr. 632.)  She reported feeling that way for about three weeks, stating she had chronic low back pain with sciatica down the left leg.  (*Id*.)  She reported taking Prednisone off and on, noting that she felt that was also depressing her.  (*Id*.)  She had been off Lexapro for about three months because it made her sleepy.  (*Id*.)  She said Dr. Siegal wanted to do surgery, and she was interested in a referral to a different neurosurgeon for a second opinion.  (*Id*.)  She denied suicidal plan or intent, but she said "the pain [was] so depressing, and she[] [was] sick of having it."  (*Id*.)  On physical examination, Ms. Harris walked with an antalgic gait and used a cane to walk.  (Tr. 633.)  CNP Wickham noted pain to palpation in the "L/S area," difficulty standing, sitting, and bending, and that Ms. Harris was alternating between standing and sitting during the visit.  (*Id*.)  Ms. Harris's diagnoses included: osteoarthritis of spine with radiculopathy, lumbar region; and degenerative disc disease, lumbosacral.  (*Id*.)  CNP Wickham

referred Ms. Harris to Dr. Andrew Grossbach at the Ohio State Wexner Center and started her on Lexapro.  (*Id.*)

On November 2, 2021, Ms. Harris presented to Andrew J. Grossbach, M.D., for a second opinion regarding her back and leg pain.  (Tr. 619.)  On examination, Ms. Harris was alert and oriented.  (*Id.*)  Her cranial nerves 2-12 were intact.  (*Id.*)  Her strength was 5/5 in the upper and lower extremities.  (*Id.*)  Her gait was antalgic, but she walked with a straightforward posture, and she could heel and toe walk.  (*Id.*)  Dr. Grossbach noted that Ms. Harris's MRI showed degenerative disc disease, worse at the L5-S1, with disc space collapse and bilateral foraminal stenosis.  (*Id.*; *see also* Tr. 618.)  He also noted that Ms. Harris's x-ray showed degenerative disc disease, worse at L5-S1.  (Tr. 619; *see also* Tr. 615.)  He discussed and recommended water-based physical therapy and an epidural steroid injection as next steps, and he noted that she would be a candidate for L5-S1 TLIF, but that "should be a last resort."  (Tr. 619.)

Ms. Harris returned to CNP Wickham for a medication refill on November 16, 2021.  (Tr. 630.)  She reported that Dr. Grossbach "put her in water aquatics," but she had not gone.  (*Id.*)  She also reported that Dr. Grossbach offered her a steroid injection in her lower back, but she declined.  (*Id.*)  She said she had "a few good days, but more bad," and she was "'tolerating the pain as well as she [could].'"  (*Id.*)  She was using marijuana intermittently.  (*Id.*)  Ms. Harris's musculoskeletal examination findings were unremarkable.  (Tr. 631.)  Her diagnoses included lumbar degenerative disc disease.  (*Id.*)  Ms. Harris continued to receive chiropractic treatment intermittently during 2022 and 2023 at Crestline Chiropractic Clinic.  (Tr. 1197, 1200, 1202, 1205, 1206, 1208.)

2.    **Opinion Evidence**

i.    **Treating Source**

CNP Wickham completed a Physical Capacity Evaluation on February 22, 2022. (Tr. 719-20.)  She listed the following diagnoses: osteoarthritis of the spine with radiculopathy, lumbar region; and degenerative disc disease, lumbar spine.  (Tr. 719.)  She opined that Ms. Harris could lift/carry five pounds on a frequent or occasional basis.  (*Id*.)  In an eight-hour workday, she opined that Ms. Harris could walk less than 30 minutes, stand less than 30 minutes, and sit less than 30 minutes.  (*Id*.)  She also opined that Ms. Harris: would require a job that allowed her flexibility to change positions from sitting to standing at-will every 15 minutes; would need to walk around, lay down, or otherwise be "off task" 80% of the workday, and to changing positions at will; would need to use an assistive device for walking and balancing; and would need to lie down four times during an eight-hour workday.  (*Id*.)  CNP Wickham said the following medical findings supported these limitations: severe lumbosacral pain, degenerative disc disease, and that Ms. Harris was observed lying on the table in the exam room.  (*Id*.)

With respect to postural limitations, CNP Wickham opined that Ms. Harris could never twist or bend and could crouch, climb stairs, and climb ladders "very little."  (*Id*.)  When asked to identify the medical findings that supported the noted postural limitations, CNP Wickham indicated that Ms. Harris "attempted to stoop/bend/twist during examination with no success." (*Id*.)  CNP Wickham opined that Ms. Harris's difficulties with balancing and her need to use a cane were due to lumbosacral pain.  (*Id*.)

CNP Wickham further opined that Ms. Harris could: never reach laterally, feel, or push/pull; occasionally reach overhead and in front; occasionally handle; and frequently finger. (Tr. 720.)  CNP Wickham explained that reaching overhead and laterally caused pain.  (*Id*.)  She

indicated that Ms. Harris's neuropathy in her lower extremities and feet supported the

limitations.  (*Id*.)  CNP Wickham also opined that Ms. Harris had environmental restrictions,

including avoidance of: exposure to noise, fumes, odors, and dusts; even moderate exposure to

vibration; and all exposure to extreme cold and heat and hazards.  (*Id*.)  CNP Wickham noted

that vibrations would cause lower back pain.  (*Id*.)  CNP Wickham found no mental limitations.

(*Id*.)  She opined that Ms. Harris could perform the identified activities on a sustained workday

basis 0-3 days per week and less than 3 consecutive weeks per month.  (*Id*.)

### ii.    Consultative Examiner

On July 23, 2023, Ms. Harris presented to Gianna Katsaros, M.D., for a consultative

medical examination.  (Tr. 1140-48.)  Her chief complaint was degenerative disc disease.  (Tr.

1140.)  She also reported symptoms related to overactive bladder and restless leg syndrome.  (Tr.

1140-41.)  She said she was prescribed medical marijuana for her chronic pain, and that it also

helped with her anxiety and difficulty sleeping.  (Tr. 1140.)  She had been provided with home

exercises but could not tolerate the exercises due to pain.  (*Id*.)  She rated her pain 8/10 on most

days.  (*Id*.)  She said that walking and standing made her pain worse.  (*Id*.)  She needed seated

modifications to dress without assistance and she had to use a shower chair to get through a

shower.  (*Id*.)  She also had to take breaks while cooking.  (*Id*.)  She had a hard time getting into

low cars and usually relied on others to drive.  (*Id*.)  She had consulted with several surgeons but

received mixed answers on how helpful surgery would be.  (*Id*.)  She treated with a chiropractor

every couple of weeks, when her pain was extremely severe, but he was only approved for

fifteen visits each year.  (*Id*.)

On examination, Ms. Harris exhibited reduced range of motion over the cervical and

lumbar spines and the lower extremity joints, including the hips and knees.  (Tr. 1144-45.)   Dr.

Katsaros noted tenderness to palpation in the lumbar spine, full strength (5/5) in the upper extremities, and reduced strength (4/5) in the lower extremities. (Tr. 1142, 1147.)  Ms. Harris had pain with straight leg raise testing and shuffled her left lower extremity when walking. (Tr. 1142, 1146.)  She did not use an assistive device. (Tr. 1142.)  She was unable to heel to toe walk due to instability when standing on either leg independently. (*Id.*)  She was able to squat but needed assistance getting up. (Tr. 1142, 1146.)  She required increased effort to get from a seated to a standing position. (Tr. 1142.)  Her sensation was intact to light touch and her deep tendon reflexes were 2+ symmetrically at the brachioradialis and patella tendons. (*Id.*)

Dr. Katsaros opined that Ms. Harris should be able to: sit, stand for 10-15 minutes, and walk for 10 minutes. (Tr. 1143.)  Dr. Katsaros noted that Ms. Harris was able to get on and off the table without assistance or visible discomfort. (*Id.*)  Dr. Katsaros also opined that an assistive device should not be required, that Ms. Harris should be able to lift and carry objects weighing 5 pounds for 5 feet without difficulty, and that she could fasten buttons and use zippers. (*Id.*)  Dr. Katsaros noted that Ms. Harris could hear and speak without difficulty and exhibited good judgment and coordination to avoid hazards in the workplace and at home, but she would not be able to travel independently. (*Id.*)

### iii.    State Agency Medical Consultants

On August 5, 2023, state agency medical consultant Diane Manos, M.D., reviewed Dr. Katsaros's consultative opinion and found it was not entirely consistent with or supported by the overall evidence on file. (Tr. 836.)  Dr. Manos explained that Ms. Harris was not in acute distress at the consultative examination, she was sitting comfortably, and her overall strength was nearly normal throughout. (*Id.*)  Dr. Manos also noted that Ms. Harris did not need an assistive device to ambulate. (*Id.*)  Dr. Manos opined that Ms. Harris could perform light work,

except she: could occasionally climb ramps and stairs; should avoid climbing ladders, ropes and scaffolds; could frequently stoop, kneel, crouch or crawl; and should avoid exposure to hazards including moving machinery, heavy machinery or unprotected heights. (Tr. 837.)

In addition to Dr. Manos's more recent opinion, there are also state agency medical consultant opinions from an earlier period.  (Tr. 53-92.)  In February 2020 and July 2020, state agency medical consultants Steve McKee, M.D., and Leon Hughes, M.D., reviewed the evidence that was available at the time and concluded that Ms. Harris could perform a limited range of medium work.  (Tr. 58-59, 68-69, 79-80, 88-89.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

Ms. Harris testified in response to questioning by the ALJ and her counsel at a telephonic hearing on August 8, 2024.  (Tr. 767-80.)  She lived in her home with her daughter.  (Tr. 767.)  She had a driver's license, but said she had not had a car for a number of years and her mother drove her places.  (*Id*.)  She testified about her last work attempt which was at Shutterfly, explaining that she performed computer work and also performed work as a laborer lifting and carrying boxes.  (Tr. 768-72, 776-77.)

When asked what prevented her from working, Ms. Harris said it was her low back pain due to degenerative disc disease.  (Tr. 772.)  If she slept too long, she said she had a lot of numbness and tossed and turned.  (*Id*.)  She had to use a shower chair and used a cane daily.  (*Id*.)  On really bad days, she used a walker with a commode because there were times when she could not get to the bathroom quickly enough.  (Tr. 772, 778.)  She also reported drowsiness from her medications.  (Tr. 772-73.)

Ms. Harris testified that she usually had someone do her grocery shopping for her.  (Tr. 773.)  If she went shopping herself, she had to use one of the scooters at the store because she could not walk for very long.  (*Id*.)  At the time of the hearing, she was in a splint and could not go up and down stairs.  (Tr. 773.)  She reported no problems bathing or dressing herself.  (*Id*.)  She estimated that she could lift five pounds.  (Tr. 773-74.)  As to how far she could walk, Ms. Harris said she "could probably make it from the car to [the] doors" at a retail store like Walmart.  (Tr. 774.)  She estimated that she could stand for about five minutes before "everything start[ed] to hurt," explaining she would get shooting pain in her hips and muscle spasms.  (*Id*.)  She could sit for longer than she could stand, and estimated she could probably sit for a couple of hours, but explained that how long she could sit was dependent on what she was sitting on.  (Tr. 774, 777-78.)  For instance, if she was sitting on something low, "it [would] kill [her]."  (Tr. 774.)  But if she was sitting on something high, it would not be as bad for her.  (*Id*.)  She was able to reach overhead "a little bit."  (Tr. 776.)

On a typical day, she tried to keep her left foot up so it would heal.  (Tr. 774, 776, 779.)  She said her left foot started to be a real problem at the beginning of 2024.  (Tr. 776.)  Her doctors were keeping an eye on it to see if they were going to need to amputate it.  (*Id*.)

Ms. Harris said her daughter did the housework and took care of the animals.  (Tr. 774.)  Ms. Harris could prepare very simple dishes, like macaroni and cheese.  (*Id*.)  She tried to help wash the dishes, but usually let her daughter take over and finish the chore.  (*Id*.)  Her limit was about five minutes before her daughter would take over.  (Tr. 774, 778.)  She would then need to rest for about twenty to thirty minutes before working again for five minutes.  (Tr. 779.)  She did try to vacuum as much as she could because they had a lot of animals.  (Tr. 775.)  She could not

do the laundry because the washing machine was located in the basement. (*Id.*) Her daughter did the yardwork, but she sometimes tried to help. (*Id.*) She had no hobbies. (*Id.*)

Ms. Harris said her doctors told her there was nothing they can do for her back and advised her to take Tylenol or ibuprofen for her pain, but that did not help. (*Id.*) She had been using a cane prescribed by her doctors for about a year. (Tr. 775-76.) She did not have a particular position that was most comfortable for her; she just moved around a lot. (Tr. 780.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 780-93.) The VE classified Ms. Harris's past work as: laborer stores, an unskilled, medium level job, performed by Ms. Harris at the light level; and photo checker, a semi-skilled, light level job, performed by Ms. Harris at the sedentary level. (Tr. 780-81.)

The VE testified that a hypothetical individual of Ms. Harris's age, education, and work experience, and with the functional limitations described in the ALJ's RFC determination for the period prior to July 23, 2023 (Tr. 731, 781, 789), could perform representative light positions in the national economy such as: assembler, inspector, and housekeeping/cleaner (Tr. 746-47, 781-82). If the hypothetical individual was unable to lift more than five pounds frequently or occasionally, she would not be able to perform the light jobs identified. (Tr. 791-92.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; § 416.920[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his August 28, 2024 decision, the ALJ made the following findings:[3]

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.  (Tr. 727.)

2.    The claimant has not engaged in substantial gainful activity since July 29, 2020, the amended alleged onset date.  (Tr. 727-28.)

3.    Since the amended alleged onset date of disability, July 29, 2020, the claimant has had the following severe impairments: degenerative disc and joint disease of the spine, asthma, chronic obstructive pulmonary disease (COPD), peripheral vascular disease, obesity, Chiari malformation, and headaches.[4]  (Tr. 728.)

4.    Since July 29, 2020, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 730-31.)

5.    Prior to July 23, 2023, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could occasionally climb ramps and stairs; she should avoid climbing ladders, ropes, and scaffolds; could up to frequently stoop, kneel, crouch, and crawl; should avoid exposure to workplace hazards, such as unprotected heights, and dangerous, unprotected, moving, mechanical parts; and should have no more than occasional exposure to concentrated irritants such as visible dust clouds, noxious odors, caustic fumes, and other pulmonary irritants.  (Tr. 731-40.)

6.    Since July 23, 2023, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could occasionally climb ramps and stairs; should avoid climbing ladders, ropes, and scaffolds; could up to frequently stoop, kneel, crouch, and crawl; should avoid exposure to workplace hazards, such as unprotected heights, and dangerous, unprotected, moving, mechanical parts; should have no more than occasional exposure to concentrated

---

[3] The ALJ's findings are summarized.

[4] The ALJ also found Plaintiff had other physical impairments that were not severe and she had no severe mental health impairments.  (Tr. 728-30.)

irritants such as visible dust clouds, noxious odors, caustic fumes, and other pulmonary irritants.  (Tr. 740-45.)

7.  Since July 29, 2020, the claimant is unable to perform any past relevant work.  (Tr. 745-46.)

8.  Prior to the established disability onset date, the claimant was a younger individual age 18-49.  (Tr. 746.)  However, during 2023, when the claimant attained the age of 50, the claimant's age category changed to an individual closely approaching advanced age.  (*Id.*)

9.  The claimant has a limited education.  (*Id.*)

10.  Transferability of job skills is not an issue because the claimant's past relevant work is unskilled.  (*Id.*)

11.  Prior to July 23, 2023, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in the national economy that the claimant could have performed, including assembler, inspector, and housekeeping/cleaner.  (Tr. 746-47.)

12.  Beginning on July 23, 2023, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 747.)

Based on the foregoing, the ALJ found Ms. Harris was not disabled prior to July 23, 2023, but became disabled on that date and continued to be disabled through the date of the decision.  (Tr. 747.)  Also, the ALJ found Ms. Harris was not under a disability within the meaning of the Social Security Act at any time through September 30, 2021, the date last insured.  (*Id.*)

## V.  Plaintiff's Arguments

Ms. Harris initially presented two arguments on appeal.  (ECF Doc. 10, pp. 1, 9-17.)  In her reply brief she conceded the first argument.[5]  (ECF Doc. 13, p. 1.)  In her only remaining

---

[5] In her first assignment of error, Ms. Harris argued that the ALJ impermissibly interpreted a critical body of objective medical evidence that was not reviewed by any medical source and substituted his interpretation for that of Ms. Harris's treating and examining physicians.  (ECF Doc. 10, pp. 1, 9-14.)

assignment of error, Ms. Harris argues that the ALJ did not adequately explain why he did not adopt the lifting/carrying/walking/standing limitations set forth in the opinions of Dr. Katsaros and CNP Wickham, and did not carry his burden at Step Five.  (ECF Doc. 10, pp. 14-17, ECF Doc. 13, pp. 1-4.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     Sole Assignment of Error: The ALJ Adequately Considered the Opinions of Dr. Katsaros and CNP Wickham When Assessing Plaintiff's Physical RFC**

In her sole assignment of error, Ms. Harris argues that the ALJ did not adequately explain why the lifting/carrying/standing/walking limitations described in the medical opinions of Dr. Katsaros and CNP Wickham were not adopted, and that the ALJ did not carry his burden at Step Five.  (ECF Doc. 10, pp. 14-17, ECF Doc. 13, pp. 1-4.)  The Commissioner responds that the ALJ accounted for limitations supported by the record and sufficiently explained why the more restrictive lifting/carrying/standing/walking limitations contained in the opinions of Dr. Katsaros and CNP Wickham were not included in the RFC.  (ECF Doc. 12, pp. 16-19.)

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. *See* 20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c); *see also Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.") Thus, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Id.* Even where an opinion was given great weight under the prior regulations, the Sixth Circuit noted that "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Nevertheless, Social Security Ruling 96-8p requires the ALJ to consider all medical opinions in his RFC assessment and, where his assessment "conflicts with an opinion from a medical source," he "must explain why the opinion was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34478 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).

The ALJ found Ms. Harris had the residual functional capacity to perform a reduced range of light work prior to July 23, 2023 (Tr. 731, 735), with a reduction in exertional capacity to a sedentary level beginning on July 23, 2023. (Tr. 742-75). Ms. Harris does not specifically argue that these RFC determinations lack the support of substantial evidence. She argues instead that the ALJ erred by finding Dr. Katsaros's opinion "generally persuasive" but failing to provide a clear rationale for not adopting a limitation to lifting or carrying no more than five pounds or more restrictive walking or standing limitations. (ECF Doc. 10, pp. 14-17, ECF Doc. 13.) She argues this error was not harmless because the opinions of Dr. Katsaros and CNP

Wickham were consistent as to Ms. Harris's ability to lift or carry no more than five pounds and because the VE testified that the only job that would be available to an individual who was limited to lifting five pounds would be the sedentary position of office helper, when the ALJ found Ms. Harris could also perform other jobs.  (ECF Doc. 10, p. 17, ECF Doc. 13, p. 2.)

The ALJ found CNP Wickham's February 2022 opinion as to Ms. Harris's physical limitations—which included a restriction to lifting/carrying five pounds and sitting, standing, and walking less than 30 minutes each—no more than partially persuasive because the limitations were "more restrictive than the objective treatment notes of the time support."  (Tr. 739-40.)  In reaching this determination, the ALJ explained:

> The undersigned finds the specific reaching and manipulative limits inconsistent with the evidence of record. While the claimant had noted some cervical spine degeneration and reported some presence of neck pain, radicular neck pain into the upper extremities was not routinely reported to providers. The claimant routinely exhibited normal muscle tone and bulk and showed intact coordination and motor functioning (Exhibit 7F/9; 15F/5; 16F/4). The claimant showed 5/5 strength in the upper extremities (Exhibit 16F/8). There was no EMG testing or nerve testing in the record supporting such manipulative limits in the upper extremities. Thus, the undersigned notes they are not supported by or consistent with the record. The undersigned finds while the record does support exertional, postural, and environmental limits, the limits noted by this provider are more restrictive than the evidence of the time. The record during this period of time showed some intermittent positive straight leg testing to the left leg and some intermittent antalgic gait. However, the claimant displayed intact coordination, intact motor function, intact muscle tone and bulk without atrophy, no evidence of pronator drift, and normal reflexes, with intact sensation (Exhibit 7F/9; 15F/5). The claimant also at times showed no gait or stance deficits (Exhibit 15F/5). The claimant even when showing some irregular gait showed 5/5 strength in her extremities (Exhibit 15F/5). While the provider cited recurrent balance issues requiring use of assistive device, the record does not support an assistive device was medically necessary during this period of time. Even when the record objectively supported some deterioration in her findings, examiners were not finding assistive devices medically necessary or observed (Exhibit 19F/3) . . . Thus, the undersigned finds this assessment no more than partially persuasive as it supports some physical limitation, but notes it is no more than partially persuasive as the limitations assessed are more restrictive than the objective evidence as discussed herein and within the decision above supports.

(*Id*. (emphasis added).)

21

The ALJ also evaluated the opinion of Dr. Katsaros, which is dated July 23, 2023, the date that the ALJ concluded Ms. Harris became disabled.  In doing so, the ALJ acknowledged that Dr. Katsaros opined that Ms. Harris was limited to lifting/carrying objects of five pounds or less and would be limited to standing for 10-15 minutes and walking for 10 minutes.  (Tr. 744.) While the record supported a reduction in exertional capacity, the ALJ explained he did not adopt Dr. Katsaros's more restrictive limitations, explaining:

> The undersigned has not adopted the exertional restrictions on lifting/carrying/standing/walking verbatim; however, the undersigned finds the reduction in exertional capacity internally consistent with the claimant's examination findings supporting shuffling gait, difficulty with heel to toe walking due to observed instability, positive straight leg testing, and observed 4/5 strength in the lower extremities. The diagnostic testing from this time supporting ongoing worsening spinal degeneration was also supportive of the greater exertional reduction. The undersigned finds the additional later evidence of record from 2024 with diagnosed peripheral vascular/arterial disease resulting in decreased circulation to the legs with intermittent leg claudication requiring invasive bypass intervention supportive of the ongoing need for more restrictive exertional reduction. Thus, while the opinion was not adopted verbatim, it was found generally persuasive in so far as it supported exertional reduction to the sedentary level.

(*Id.* (emphasis added).)  The ALJ explained further that Dr. Katsaros's opinion that there were no handling limitations was "consistent with the examination findings and supported by the other evidence of record," noting that the record did not support "any upper extremity strength deficits or coordination problems" and that Ms. Harris "did not show any objective nerve deficits in the upper extremities."  (*Id.*)

The undersigned finds that the ALJ's analysis of CNP Wickham's and Dr. Katsaros's opinions (Tr. 739-40, 744), considered in combination with his earlier analysis of the medical evidence of record (Tr. 734-35), articulate a sufficient and clear rationale for the ALJ's decision not to adopt the more restrictive exertional limitations, including the limitation to lifting/carrying

five pounds.  First, as detailed above, when evaluating CNP Wickham's and Dr. Katsaros's

opinions, the ALJ observed the following:

- While the claimant had noted some cervical spine degeneration and reported some presence of neck pain, radicular neck pain into the upper extremities was not routinely reported to providers (Tr. 739);

- The claimant routinely exhibited normal muscle tone and bulk and showed intact coordination and motor functioning (*id*.);

- The claimant showed 5/5 strength in the upper extremities (*id*.);

- The claimant displayed intact coordination, intact motor function, intact muscle tone and bulk without atrophy, no evidence of pronator drift, and normal reflexes, with intact sensation (Tr. 739-40);

- The claimant also at times showed no gait or stance deficits (Tr. 740);

- Even when the claimant showed some irregular gait, she also showed 5/5 strength in her extremities (*id*.)

- The record does not support any upper extremity strength deficits or coordination problems (Tr. 744);

- The claimant did not show any objective nerve deficits in the upper extremities (*id*.).

Ms. Harris does not challenge these findings or contend that the ALJ mischaracterized the

record.  Next, after detailing Ms. Harris's treatment history and examination findings regarding

her neck and back conditions prior to July 23, 2023 (Tr. 734-35), the ALJ found that:

> While the claimant exhibited neck and back pain during this period of time and showed cervical and lumbar spine degenerative disc and joint disease, the record supports no more than intermittent conservative treatment. Further, while other treatment modalities were recommended, such as therapy and injections and potential surgery, the claimant did not follow up with any of these treatments during the relevant period. The claimant opted to intermittently utilize marijuana and noted she was tolerating the pain during this time the best she could. While she reported pain, the record noted only intermittent antalgic gait and showed intact strength in her upper and lower extremities. She evidenced intact heel and toe walking and there was no documented sensory deficits. The claimant maintained intact reflexes, showed no involuntary movements, and maintained intact coordination with normal muscle tone and bulk. There were no reports of falls or treatment for fall related injuries. She sought emergent treatment in June and July 2021 but required no

23

invasive treatment, receiving no more than an acute steroid and pain medication. The claimant was not described as being in intractable pain. Despite her reported back and neck pain during this time, she was living independently, caring for a disabled child, caring for pets, intermittently driving, and continued to manage her home.

(Tr. 735.)  Again, Ms. Harris does not challenge these findings.

While Ms. Harris may disagree with the ALJ's decision not to adopt the very restrictive lifting/carrying/standing/walking limitations described in the opinions of Dr. Katsaros and CNP Wickham, she fails to demonstrate that the ALJ's decision lacks the support of substantial evidence. *Jones*, 336 F.3d at 477 (finding a reviewing court cannot overturn the Commissioner's decision, even if substantial evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ").  Moreover, the ALJ's analysis of the medical evidence and the two opinions provides a sufficiently clear rationale for the ALJ's decision not to adopt the very restrictive lifting/carrying/standing/walking limitations contained in Dr. Katsaros's and CNP Wickham's opinions.[6]

For the reasons set forth above, the undersigned concludes that the ALJ did not run afoul of the requirements in SSR 96-8p when he explained why he did not adopt the lifting/carrying/standing/walking limitations described in the medical opinions of Dr. Katsaros and CNP Wickham.  Further, given the record evidence, the undersigned concludes that Ms. Harris has not shown that the ALJ erred when he did not include those more restrictive exertional limitations in the RFC.[7]  Accordingly, the undersigned concludes that Plaintiff's sole assignment of error lacks merit.

---

[6] In her reply brief, Ms. Harris contends that the Commissioner improperly relies on post-hoc rationale to argue that the ALJ sufficiently explained why he did not adopt the limitations set forth in Dr. Katsaros's opinion.  (ECF Doc. 13, pp. 1-2.)  But the undersigned finds the Commissioner's argument to be premised on record evidence explicitly considered and discussed by the ALJ in evaluating the medical opinion evidence and assessing Plaintiff's RFC.

[7] Ms. Harris also argues that the ALJ did not carry his burden at Step Five because the hypothetical question relied upon by the ALJ did not adequately account for Ms. Harris's lifting and carrying limitations.  (ECF Doc. 10, p. 17.)

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


November 25, 2025


*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge



### **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

---

But an ALJ need only include limitations he finds supported by the evidence in his hypothetical questions. *Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.").  Since the undersigned concluded herein that the ALJ did not err when he failed to adopt the lifting and carrying limitations contained in Dr. Katsaros's or CNP Wikham's opinions, the undersigned further concludes that Ms. Harris's Step Five argument is without merit.